THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: October 8, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*DowntownDC Business Improvement District*

*v.*

*Roquois Y. Clarke*

———

Opposition No. 91275100

———

Curtis A. Boykin of Douglas & Boykin PLLC
　　for DowntownDC Business Improvement District, Plaintiff.

Robert Powers of McClanahan Powers, PLLC
　　for Roquois Y. Clarke, Defendant.

———

Before Wellington, Goodman and Dunn,
　　Administrative Trademark Judges.

Opinion by Goodman, Administrative Trademark Judge:

Roquois Y. Clarke (Applicant) seeks registration on the Principal Register of the mark DISTRICT OF FASHION (in standard characters, FASHION disclaimed), identifying "Fashion show exhibitions for commercial purposes; Organisation of fashion shows for commercial purposes; Organization of fashion shows for commercial

purposes; Organization of fashion shows for promotional purposes"[1] in International Class 35.[2]

DowntownDC Business Improvement District (Opposer or BID) opposes registration on the ground of likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), based on its prior use of DOWNTOWNDC DISTRICT OF FASHION in connection with the organization of fashion shows, and on the ground of fraud on the Office. Opposer pleads ownership of a trademark application for the mark DOWNTOWNDC DISTRICT OF FASHION on the Principal Register for "Fashion show exhibitions for commercial purposes; Organisation of fashion shows for commercial purposes; Organization of fashion shows for promotional purposes" in International Class 35.[3]

In her answer, Applicant denies the salient allegations in the notice of opposition.[4]

---

[1] The USPTO Trademark ID manual employs both American English ("organization") and British English ("organization") spellings with fashion show ID manual entries.

[2] Application Serial No. 90569561 was filed on March 9, 2021 based on intent to use under Section 1051(b) of the Trademark Act, 15 U.S.C. § 1051(b).

[3] Application Serial No. 90724416, filed May 20, 2021.

[4] 4 TTABVUE.

Record citations in this decision are to TTABVUE, the Board's publicly available docket history system. Specifically, the number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

This opinion cites to the Federal Reporter for decisions of the U.S. Court of Appeals for the Federal Circuit and the U.S. Court of Customs and Patent Appeals and other federal courts. For decisions of the Board, this opinion cites to the LEXIS database. See the TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 101.03 (2024) for acceptable citation forms to TTAB cases.

Opposer and Applicant filed main briefs, and Opposer filed a reply brief.[5]

As plaintiff, Opposer bears the burden of proving its entitlement to a statutory cause of action and its Section 2(d) claim by a preponderance of the evidence. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015) ("The party opposing registration bears the burden of proof, see [Trademark Rule 2.116(b), 37 C.F.R.] §2.116(b), and if that burden cannot be met, the opposed mark must be registered, see 15 U.S.C. §1063(b)"). For the fraud claim, Opposer bears the heavy burden of proving fraud by clear and convincing evidence. *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (quoting *Smith Int'l, Inc. v. Olin Corp.*, Opp. No. 91059261, 1981 TTAB LEXIS 47, at *27 (TTAB 1981)).

I. Preliminary Matter

As a preliminary matter, we address both parties' submission of the same written transcripts of two audio recordings (Zoom meeting and telephone conversation both recorded by Applicant and transcribed by Esquire Deposition Solutions) under notice of reliance.[6] Some of Opposer's witnesses also testified regarding these meetings/conversations and referred to these exhibits (written transcriptions of the Zoom meeting and telephone conversation) in the notice of reliance in lieu of submitting these transcripts as exhibits to their testimony.[7]

---

[5] 23, 24 and 25 TTABVUE.

[6] Neither party submitted the audio recordings of these meetings/conversations.

[7] Declarations of Nabavi Oliver, Chief Operating Officer of Opposer, 11 TTABVUE; and Neil Albert, former Chief Executive Officer of Opposer, 13 and 21 TTABVUE.

Although these written transcriptions are not admissible under notice of reliance, we find by virtue of the dual submissions that the parties have effectively stipulated to the transcripts' admission into evidence.[8] *Cf.* Trademark Rule 2.123(b), 37 C.F.R. § 2.123(b); TBMP § 702.04(e). As for authentication, the identity of the speakers in these meetings/conversations has been established by Esquire Deposition Solutions' transcriptions, and neither party disputes the accuracy of the written transcriptions. *See e.g.*, Declaration of Neil Albert, former CEO of Opposer ("Exhibit 4, Transcript Audio File RYC 000207, is a complete and accurate recording of the conversation I had with Ms. Clarke on March 11, 2021.").[9]

The Board therefore finds the transcripts admissible and will give them due consideration.

## II. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the involved application.

Opposer submitted notices of reliance upon documentary evidence[10] and discovery responses, 9, 10, and 22 TTABVUE.

---

[8] Opposer's notice of reliance exhibit 7, 9 TTABVUE 7-33; Opposer's notice of reliance exhibit 4, 10 TTABVUE 31-59; Applicant's notice of reliance exhibits M and L, 16 TTABVUE 150-176, 178-207.

[9] Albert declaration paragraph 12, 13 TTABVUE.

[10] Both parties submitted most of the same documents that were provided or obtained in connection with discovery requests under notice of reliance, and neither party submitted a stipulation as to admissibility for those documents that are not printed publications, internet materials or official records. Documents that are not printed publications or internet materials or official records are not admissible under notice of reliance. Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e); *see also* Trademark Rule 2.120(k)(3)(ii), 37 C.F.R. §

Opposer introduced the declarations[11] of Nabavi Oliver, Opposer's Chief Operating Officer and prior Director of Administration, 11 and 20 TTABVUE; the

---

2.120(k)(3)(ii)) (regarding documents produced in discovery or through disclosure). *Boston Athletic Ass'n v. Velocity, LLC*, Opp. No. 91202562, 2015 TTAB LEXIS 459, at *5 (TTAB 2015) ("Generally, a party that has obtained documents through a response to a request for production of documents may not make the documents of record by notice of reliance alone[.]") (citing Trademark Rule 2.120(j)(3)(ii), renumbered by amendment to Trademark Rule 2.120(k)(3)(ii), 37 C.F.R. § 2.120(k)(3)(ii)).

However, some of the submitted witness testimony refers to and authenticates many of these documents in lieu of providing the documents as exhibits to testimony; we have considered these documents to the extent they were referred to by witness testimony. Also, we have considered those documents that are internet materials that reflect the URL and date printed.

Additionally, to the extent the parties discuss certain portions of these documents in their briefs (and they are not the subject of witness testimony), we deem these portions stipulated into the record for the truth of the matter asserted therein. *See WeaponX Performance Prods. v. Weapon X Motorsports, Inc.*, Opp. No. 91221553, 2018 TTAB LEXIS 72, at *11 (TTAB 2018) (although internet evidence is hearsay, portions of internet evidence discussed by both parties considered stipulated to for the truth of the matter).

Applicant submitted its own discovery responses (e.g., requests for admission, which Opposer also submitted under notice of reliance); Opposer submitted its own supplemental discovery responses (responses to interrogatories) that Applicant also submitted under notice of reliance. There is no provision in the Trademark Rules that allows for introduction by notice of reliance of one's own produced documents. A party may not make its own discovery responses (interrogatory responses and requests for admission) of record except to the extent necessary to make not misleading the discovery responses submitted by the inquiring party. Trademark Rule 2.120(k)(5), 37 C.F.R. § 2.120(k)(5)). Since the complete responses were provided by the opponent, it was unnecessary for Applicant or Opposer to submit the same responses under notice of reliance.

We note that Applicant also submitted Opposer's supplemental responses to document requests under notice of reliance. Responses to document requests are admissible solely for purposes of showing that a party has stated that there are no responsive documents. *See City Nat'l Bank v. OPGI Mgmt.,* Can No. 92050730, 2013 TTAB LEXIS 189, at *16 n.10 (TTAB 2013).

[11] Although Opposer titled the witness testimony as affidavits, this testimony was provided under penalty of perjury and not under oath (notarized). The testimony affidavit (notarized) is a sworn statement, while the declaration permits a comparable alternative unsworn statement under penalty of perjury. *See* 28 U.S.C. § 1746; TBMP § 703.01(h) Note 2; TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 804.01(b) (May 2024) ("Under 35 U.S.C. §25, the USPTO is authorized to accept a declaration under 37 C.F.R. §2.20 or 28 U.S.C. §1746 instead of an oath. These declarations can be used whenever the Act or rules require that a document be verified or under oath."). This testimony is more appropriately identified as declaration testimony which we have done here.

declaration of Rachel Hartman, Opposer's former Director of Interactive Marketing and Communications and current Executive Director, 12 TTABVUE; and the declarations of Neil Albert, Opposer's former Chief Executive Officer between 2015 through 2022, 13 and 21 TTABVUE. The declarations refer to exhibits in the notices of reliance rather than having attached exhibits.

Applicant submitted a notice of reliance on documentary evidence and discovery responses,[12] 16 TTABVUE.

Applicant introduced the declaration of Applicant, Roquois Clarke, 15 TTABVUE; the declaration of Remi Wallace, former employee of Opposer (Events & Partnership Manager and previously, Senior Manager, Events & Partnerships), 17 TTABVUE; the declaration of Narrean Marsden, employee of Opposer (currently Social Media Associate and previously, a freelance contractor), 18 TTABVUE; and the declaration of Eva Reed, a former vendor for Opposer and owner of EvaStyles, LLC, 19 TTABVUE.[13]

In connection with its pleaded application to register DOWNTOWNDC DISTRICT OF FASHION, Opposer attached as exhibit B to the notice of opposition the TEAS

---

[12] Opposer's initial interrogatory responses are unverified. Under Fed. R. Civ. P. 33, answers to interrogatories must be verified and otherwise are not competent evidence. *Keystone Consol. Indus. v. Franklin Inv. Corp.*, Can. No. 92066927, 2024 TTAB LEXIS 290, at *23 n.32 (TTAB 2024). Opposer's supplemental interrogatory responses were signed and verified. Applicant's notice of reliance exhibit R, 16 TTABVUE 343-346 (Opposer's supplemental discovery responses); Opposer's notice of reliance exhibit 22, 22 TTABVUE 58-61 (Opposer's supplemental discovery responses).

[13] Although Applicant titled the witness testimony as affidavits, this testimony was under penalty of perjury and not under oath (notarized) and therefore is more appropriately identified as declaration testimony, which we have done here. *See* note 11 *supra*.

PLUS application for this mark, (showing the application serial number and filing date), but this exhibit is not in evidence. Trademark Rule 2.122(c), 37 C.F.R. § 2.122(c). Applicant's notice of reliance, exhibit O,[14] includes a copy of a TEAS PLUS application for DOWNTOWNDC DISTRICT OF FASHION, listing DowntownDC BID Corporation as owner. Applicant identifies this document in the notice of reliance as "Opposer's Trademark/Service Application May 20, 2021" that is "the subject of this opposition," but this TEAS PLUS application lacks the serial number and filing date showing receipt by the USPTO. This document does not appear to be obtained from USPTO records but appears to be Opposer's file copy. Consequently, this document does not qualify as an official record, as contemplated by Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e), and it is therefore not admissible by notice of reliance. *See Hard Rock Cafe Int'l (USA) Inc. v. Elsea*, Opp. No. 91101304, 2000 TTAB LEXIS 577, at *9 (TTAB 2000).

However, Applicant admitted that "on or about May 20, 2021, Opposer filed a United States federal trademark application 90724416 for the standard character mark 'DOWNTOWNDC DISTRICT OF FASHION,' without claim to any particular font style, size, or color, disclaiming the term 'DOWNTOWN DC,' for 'Fashion show exhibitions for commercial purposes; Organisation [sic] of fashion shows for commercial purposes; Organization of fashion shows for promotional purposes' in

---

[14] Applicant's notice of reliance exhibit O, 16 TTABVUE 220-223 (Opposer's TEAS PLUS application (unfiled)).

international class 35.'"[15] By virtue of Applicant's admission, these facts are established. *See UMG Recordings Inc. v. O'Rourke*, Opp. No. 91176791, 2009 TTAB LEXIS 533, at \*11 (TTAB 2009) ("An admission obviates the need to prove the admitted allegation of fact, but no more"). *Cf. W. Union Tel. Co. v. Graphnet Sys., Inc.*, Opp. No. 91058609, 1979 TTAB LEXIS 88, at \*7 n.12 (Board considered registration part of the record based on applicant's admission in its answer of opposer's ownership of the registration).

## III. Factual Background

Opposer is a not-for profit organization that operates "exclusively to promote the common business interest of businesses located in the area described as the 'Downtown BID'" in Washington, D.C.[16]

In May 2016, Opposer offered Applicant a position to work for Opposer as a Digital Content and Design Assistant.[17] Applicant's duties in this role included serving as a "point person for social media and sharing everything downtown D.C. has to offer," managing Opposer's "digital asset database," and supporting "BID's events with

---

[15] Opposer's notice of reliance exhibit 3, 10 TTABVUE 13-14 (Applicant's response to requests for admission 4); Applicant's notice of reliance exhibit V, 16 TTABVUE 382-383 (Applicant's response to requests for admission 4).

[16] Oliver declaration paragraph 4, 11 TTABVUE.

[17] Oliver declaration paragraph 6, 11 TTABVUE; Hartman declaration paragraph 3, 12 TTABVUE, Albert declaration paragraph 5, 13 TTABVUE; Clarke declaration paragraph 5, 15 TTABVUE; Opposer's notice of reliance exhibit 2, 10 TTABVUE 9 (appointment letter); Applicant's notice of reliance exhibit A, 16 TTABVUE 8 (appointment letter); Opposer's notice of reliance exhibit 3, 10 TTABVUE 13 (Applicant's response to requests for admission 1) and Applicant's notice of reliance exhibit V, 16 TTABVUE 382 (Applicant's response to requests for admission 1).

setup A/V, photography, videography."[18] Applicant also would perform "other event functions as needed."[19]

In her position, Applicant created graphics, managed social media, developed and edited video content, and managed Opposer's website.[20] Applicant also developed a social media plan and content calendar using Opposer's hardware and software to perform her work.[21] Applicant promoted Opposer's events on Opposer's website and social media channels, designed printed rack cards, signage, and free external community calendars, and supported Opposer's AV needs at in-person events.[22]

Applicant had previous experience in "high end fashion event production" in the District of Columbia and Florida.[23] Opposer learned of Applicant's past experience in producing runway shows and tasked Applicant to work on an indoor runway concept for Opposer.[24]

In particular, Applicant was assigned as a staff member of BID to work on Opposer's "effort to produce high-end, invitation-only, free runway shows and other

---

[18] Hartman declaration paragraphs 5 and 6, 12 TTABVUE; Oliver declaration paragraphs 7 and 8, 11 TTABVUE; Albert declaration paragraphs 6 and 7, 13 TTABVUE.

[19] Hartman declaration paragraph 6, 12 TTABVUE; Oliver declaration paragraph 8, 11 TTABVUE; Albert declaration paragraphs 6 and 7, 13 TTABVUE; Opposer's notice of reliance exhibit 2, 10 TTABVUE 9 (appointment letter); Applicant's notice of reliance exhibit A, 16 TTABVUE 8 (appointment letter).

[20] Clarke declaration paragraph 6, 15 TTABVUE.

[21] Hartman declaration paragraph 8, 12 TTABVUE; Opposer's notice of reliance exhibit 3, 10 TTABVUE 24 (Applicant's response to requests for admission 24); Applicant's notice of reliance exhibit V, 16 TTABVUE 393 (Applicant's response to requests for admission 24).

[22] Wallace declaration paragraph 5, 17 TTABVUE.

[23] Clarke declaration paragraph 7, 15 TTABVUE.

[24] Clarke declaration paragraph 8, 15 TTABVUE; Hartman declaration paragraphs 7 and 10, 12 TTABVUE; Wallace declaration paragraph 7, 17 TTABVUE.

events that would promote the fashion and beauty industries in the District of Columbia."[25] Opposer also directed Opposer's employee Remi Wallace, who worked on other BID events, to work on the fashion show events.[26] In a January 2019 Memorandum of Agreement (MOA) that Opposer executed with the Commission on Fashion Art Events (CFAE), Opposer agreed to provide and listed two dedicated staff members for the February 2019 and September 2019 fashion show events: Applicant and employee Remi Wallace.[27] Applicant and Ms. Wallace had additional assistance for the fashion show events from Opposer's freelance contractor at the time, Ms. Marsden, who assisted with marketing materials and day-of fashion show tasks.[28]

Applicant worked on three fashion show events that took place within a one-year period: September 2018, February 2019, and September 2019.[29] Opposer discussed Applicant's work on the September 2018 and February 2019 fashion shows in

---

[25] Hartman declaration paragraph 10, 12 TTABVUE; Opposer's notice of reliance exhibit 12, 9 TTABVUE 52-59 (Memorandum of Agreement, MOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 280-289 (MOA); Applicant's notice of reliance exhibit R, 16 TTABVUE 343-344, (Opposer's supplemental discovery responses 2 and 9); Opposer's notice of reliance for rebuttal testimony exhibit 22, 22 TTABVUE 58-59 (Opposer's supplemental discovery responses 2 and 9); Wallace declaration paragraph 7, 17 TTABVUE.

[26] Wallace declaration paragraphs 6 and 7, 17 TTABVUE.

[27] Opposer's witnesses refer to this agreement as a "memorandum of understanding," although it is titled as a "memorandum of agreement." Oliver declaration paragraph 11, 11 TTABVUE; Hartman declaration paragraph 10, 12 TTABVUE; Opposer's notice of reliance exhibit 12, 9 TTABVUE 52-59 (MOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 280-289 (MOA); Opposer's notice of reliance exhibit 13, 9 TTABVUE 61-62 (mid year review, performance evaluation); Applicant's notice of reliance exhibit R, 16 TTABVUE 344 (Opposer's supplemental interrogatory response 9); Opposer's notice of reliance for rebuttal testimony exhibit 22, 22 TTABVUE 59 (Opposer's supplemental interrogatory response 9).

[28] Marsden declaration paragraph 3, 18 TTABVUE.

[29] Clarke declaration paragraph 12, 15 TTABVUE; Hartman declaration paragraphs 7 and 12, 12 TTABVUE.

Applicant's May 2018 and June 2019 performance evaluations.[30] Applicant received her regular salary while working on the fashion show events and was paid bonuses as compensation for the additional event work.[31]

In connection with the MOA executed by Opposer with CFAE, Opposer agreed to secure the venue and production vendors, hire talent for the fashion shows, call and select designers, train models, secure hair and makeup staff and management, secure on-site managers and other production related staff, develop marketing plans and website content, and secure sponsorships.[32] Opposer relied on Applicant's fashion industry experience, marketing, and design acumen to execute the fashion show concept.[33]

Applicant's involvement included planning and executing all elements of the fashion shows.[34] Applicant promoted and held model calls, outlined the model criteria, developed the model contracts, hosted rehearsals to help train the non-

---

[30] Hartman declaration paragraphs 7, 12 and 13, 12 TTABVUE; Opposer's notice of reliance exhibits 11 and 13, 9 TTABVUE 49-50, 61-62 (mid-year reviews, performance evaluations); Applicant's notice of reliance exhibit C, 16 TTABVUE 20-23 (mid-year reviews, performance evaluations).

[31] Oliver declaration paragraph 14, 11 TTABVUE; Oliver declaration paragraph 11, 20 TTABVUE.

[32] Hartman declaration paragraphs 10 and 11, 12 TTABVUE; Opposer's notice of reliance exhibit 12, 9 TTABVUE 52-59 (MOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 280-289 (MOA).

[33] Clarke declaration paragraph 11, 15 TTABVUE; Wallace declaration paragraph 8, 17 TTABVUE; Opposer's notice of reliance exhibit 11, 9 TTABVUE 49-50 (mid-year review, performance evaluation); Applicant's notice of reliance exhibit C, 16 TTABVUE 20-21 (mid-year review, performance evaluation).

[34] Hartman declaration paragraph 10, 12 TTABVUE; Clarke declaration paragraph 11, 15 TTABVUE; Wallace declaration paragraph 8, 17 TTABVUE; Marsden declaration paragraph 4, 18 TTABVUE.

professional models, curated designers, created an application process for local designers, held meetings and fittings, secured the creative beauty director for building the hair and makeup teams for the fashion runway shows and events, solicited and sent outreach to potential sponsors, developed a media kit, hosted a call for volunteers, secured a restaurant to cater the event, selected a venue, secured lighting, floral, and décor vendors, outlined the lighting, floral, and décor vendor tasks, created the logo, press releases, marketing materials and promotional materials, including the website, video assets, and advertisements for the event, vetted the public relations firm for the event, and promoted the event through the Downtowndc.org website and social media channel as well as Applicant's personal event platforms.[35] Applicant invited "local [District Maryland and Virginia] designers, artists and businesses" to participate in the events, shows, and television appearances.[36] Applicant sought celebrity and internationally recognized partners (hair-makeup, fashion show hosts, and models) "within the fashion industry and outside the fashion industry" to bring attention to the events.[37]

As Opposer's designated staffers to the fashion show events, Applicant and Ms. Wallace identified themselves as co-creative directors of the DISTRICT OF

---

[35] Clarke declaration paragraph 11, 15 TTABVUE; Wallace declaration paragraph 9, 17 TTABVUE; Reed declaration paragraphs 6-7, 19 TTABVUE; Opposer's notice of reliance exhibits 12 and 13, 9 TTABVUE 52-59; 61-62 (MOA and mid-year review, performance evaluation); Applicant's notice of reliance exhibits C and Q, 16 TTABVUE 22-23, 280-289 (mid-year review, performance evaluation and MOA); Opposer's notice of reliance exhibit 15, 9 TTABVUE 66-73 (internet materials).

[36] Reed declaration paragraph 10, 19 TTABVUE.

[37] Clarke declaration paragraph 12, 15 TTABVUE.

FASHION.[38] According to witness testimony, Applicant suggested to Opposer the co-creative director title to be used to professionally solicit partners and engagement, although there was never an official title change for Applicant or Ms. Wallace's positions.[39]

Opposer and the District of Columbia Government provided monetary and in-kind sponsorships to pay for and promote the DISTRICT OF FASHION.[40] Opposer's employee Ms. Hartman executed agreements and purchase orders on behalf of Opposer's sponsorship of the DISTRICT OF FASHION events.[41] Applicant and Ms. Wallace "submitted quotes and invoices to [Opposer] to pay for vendors and talent,"[42] and Opposer's senior management expressly approved "any task or expense" in connection with the DISTRICT OF FASHION events.[43] Applicant and Ms. Wallace advanced costs with the "expectation of reimbursement,"[44] and Opposer reimbursed them "for expenses they incurred in connection with the runway fashion shows."[45]

---

[38] Wallace declaration paragraph 9, 17 TTABVUE.

[39] Wallace declaration paragraph 9, 17 TTABVUE.

[40] Oliver declaration paragraph 7 and 13, 20 TTABVUE; Hartman declaration paragraph 15, 12 TTABVUE; Reed declaration paragraph 13, 19 TTABVUE.

[41] Hartman declaration paragraph 15, 12 TTABVUE.

[42] Wallace declaration paragraph 9, 17 TTABVUE; Oliver declaration paragraphs 6 and 8, 20 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibit 21, 22 TTABVUE 16-53 (expense and reimbursement records).

[43] Oliver declaration paragraph 5, 20 TTABVUE; Hartman declaration paragraphs 9, 14 and 15, 12 TTABVUE.

[44] Wallace declaration paragraph 9, 17 TTABVUE; Oliver declaration paragraphs 6 and 8, 20 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibit 21, 22 TTABVUE 16-53 (expense and reimbursement records).

[45] Oliver declaration paragraphs 8-10 and 12, 20 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibit 21, 22 TTABVUE 16-53 (expense and reimbursement records).

Opposer also provided Applicant and Ms. Wallace with cash advances for a trip to New York Fashion Week for "work travel."[46]

Opposer expended significant resources to develop and establish the DISTRICT OF FASHION events, paying all costs associated with promotion of the events, including the hiring of consultants.[47] Opposer spent $100,000 to promote DISTRICT OF FASHION and spent $12,000 for the selected public relations firm to market and implement its strategy for DISTRICT OF FASHION.[48]

Opposer paid for, among other things, the "2018 and 2019 venues, food, and beverage, hair and makeup, models, design, A/V, lighting, staff (including on-site managers, curators, front and back of house, event registration, security and graphic design and PR), gift bags, furniture, emcees, wi-fi, guest registration software, insurance, media, advertising, and promotion outside of in-kind donations, sponsorships and volunteers."[49] Applicant used Opposer's website, social media, and financial resources to promote the DISTRICT OF FASHION event.[50]

---

[46] Oliver declaration paragraphs 8-10 and 12, 20 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibit 21, 22 TTABVUE 16-53 (expense and reimbursement records).

[47] Oliver declaration paragraphs 10-14, 11 TTABVUE; Oliver declaration paragraphs 7 and 13, 20 TTABVUE; Hartman declaration paragraph 9, 12 TTABVUE.

[48] Oliver declaration paragraphs 13 and 14, 11 TTABVUE; Opposer's notice of reliance exhibit 6, 10 TTABVUE 70-71 (LOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 290-291 (LOA).

[49] Hartman declaration paragraph 14, 12 TTABVUE.

[50] Albert declaration paragraph 8, 21 TTABVUE; Hartman declaration paragraph 13, 12 TTABVUE. Applicant also testified that she created and used her own social media platforms (Facebook and Instagram) for promotion of the event. Clarke declaration paragraph 11, 15 TTABVUE.

During late 2020, due to the COVID-19 pandemic, Opposer had mass furloughs; Opposer furloughed most of the Marketing and Communications department except Applicant.[51] In March 2021, Opposer eliminated Applicant's position.[52] Applicant signed a separation agreement on March 29, 2021, and Opposer paid Applicant severance.[53]

During the termination meeting, Opposer offered Applicant a consultancy to produce DISTRICT OF FASHION events.[54] Although there were negotiations, Applicant did not sign the consultancy agreement.[55] In connection with the potential consultancy, Applicant wanted ownership over her claimed intellectual property, but

---

[51] Clarke declaration paragraph 18, 15 TTABVUE. During this time, Opposer had a transition of leadership. *Id.*

[52] Oliver declaration paragraph 16, 11 TTABVUE; Albert declaration paragraph 8, 13 TTABVUE; Wallace declaration paragraph 11, 17 TTABVUE; Clarke declaration paragraph 20, 15 TTABVUE; Opposer's notice of reliance exhibit 7, 9 TTABVUE 7-33 (zoom transcript) Applicant's notice of reliance exhibit L, 16 TTABVUE 150-176 (zoom transcript); Opposer's notice of reliance exhibit 3, 10 TTABVUE 25-26 (Applicant's response to requests for admission 27, 28 & 29); Applicant's notice of reliance exhibit V, 16 TTABVUE 394-395 (Applicant's response to requests for admission 27, 28 & 29).

[53] Oliver declaration paragraph 25 and 26, 11 TTABVUE; Opposer's notice of reliance exhibit 3, 10 TTABVUE 13 (Applicant's response to requests for admission 2); Applicant's notice of reliance exhibit V, 16 TTABVUE 382 (Applicant's response to requests for admission 2).

[54] Oliver declaration paragraph 16, 11 TTABVUE; Albert declaration 8, 13 TTABVUE; Clarke declaration paragraph 20, 15 TTABVUE; Opposer's notice of reliance exhibit 7, 9 TTABVUE 7-33 (zoom transcript); Applicant's notice of reliance exhibit L, 16 TTABVUE 150-176 (zoom transcript).

[55] Oliver declaration paragraphs 16-18, 21, and 22, 11 TTABVUE; Albert declaration paragraph 8, 13 TTABVUE; Clarke declaration paragraphs 20 and 22-24, 15 TTABVUE; Opposer's notice of reliance exhibit 7, 9 TTABVUE 7-33 (zoom transcript); Applicant's notice of reliance exhibit L, 16 TTABVUE 150-176 (zoom transcript); Opposer's notice of reliance exhibit 8, 9 TTABVUE 35-38 (consultant agreement); Applicant's notice of reliance exhibit J, 16 TTABVUE 132-142 (consultant agreement); Applicant's notice of reliance exhibit I, 16 TTABVUE 124-130 (email communications consultancy); Opposer's notice of reliance exhibit 3, 10 TTABVUE 25-26 (Applicant's response to requests for admission 27 & 28) and Applicant's notice of reliance exhibit V, 16 TTABVUE 394-395 (Applicant's response to request for admission 27 & 28).

the consultancy agreement indicated that the intellectual property created would belong to Opposer.[56]

Opposer then posted a consultant position for the DISTRICT OF FASHION events and later hired a full time employee to be the Creative Strategist for DISTRICT OF FASHION.[57]

Following termination from Opposer, Applicant applied for registration of the DISTRICT OF FASHION mark.[58] As a result of this filing, Opposer's counsel mailed a cease-and-desist letter to Applicant.[59] Applicant admits she has not used the DISTRICT OF FASHION mark in commerce.[60]

Applicant also admits that she created the mark "during the temporal period she was employed by Opposer."[61] But Applicant testified that she worked on the fashion

---

[56] Clarke declaration paragraphs 22 and 24, 15 TTABVUE. Opposer's notice of reliance exhibit 4 (transcript telephone conversation), 10 TTABVUE 30-59; Applicant's notice of reliance exhibit M, 16 TTABVUE 177-206 (transcript telephone conversation); Opposer's notice of reliance exhibit 3, 10 TTABVUE 26 (Applicant's response to requests for admission 29); Applicant's notice of reliance exhibit V, 16 TTABVUE 394 (Applicant's response to requests for admission 29); Opposer's notice of reliance exhibit 8, 9 TTABVUE 35-38 (consultant agreement); Applicant's notice of reliance exhibit J, 16 TTABVUE 132-142 (consultant agreement).

[57] Wallace declaration paragraph 12, 17 TTABVUE; Clarke declaration paragraph 25, 15 TTABVUE.

[58] Clarke declaration paragraph 21, 15 TTABVUE; Opposer notice of reliance exhibit 3, 10 TTABVUE 13 (Applicant's response to requests for admission 3); Applicant's notice of reliance exhibit V, 16 TTABVUE 382 (Applicant's response to requests for admission 3); Opposer's notice of reliance exhibit 10, 9 TTABVUE 46-47 (cease and desist letter).

[59] Oliver declaration paragraph 29, 11 TTABVUE.

[60] Opposer's notice of reliance exhibit 3, 10 TTABVUE 25 (Applicant's response to requests for admission 26); Applicant's notice of reliance exhibit V, 16 TTABVUE 394 (Applicant's response to requests for admission 26).

[61] Opposer's notice of reliance exhibit 3, 10 TTABVUE 14-15, 17, and 23 (Applicant's response to requests for admission 6, 11 & 21); Applicant's notice of reliance exhibit V, 16 TTABVUE 384-385, 386, 392 (Applicant's response to requests for admission 6, 11 & 21).

show project during non-work hours, created the DISTRICT OF FASHION "brand identity," and created the branding to allow any entity to sponsor the fashion show.[62] Specifically, Applicant states that she "created all the assets: brand identity, logo, business cards, website, video assets, advertisements, etc."[63]

Opposer disputes that Applicant has any ownership interest in the DISTRICT OF FASHION brand. In a telephone conversation with Mr. Albert regarding the post-employment consultancy, Applicant was "informed that by virtue of her employment with the BID, she did not own her ideas."[64] The statements made by Mr. Albert in the transcribed telephone conversation are not hearsay, as Mr. Albert is one of the speakers and has testified in his declarations as to the truth of his statements. Applicant's statements in the transcribed telephone conversation are not hearsay because they are a statement of a party. Fed. R. Evid. 801(d)(2)(A).

> Roquois Clarke: … I also don't want to sign any soul away and say that the BID owns every idea and everything that I've done. Like, that's –you know or everything that I will be doing once I sign the [consultancy] contract. …
>
> Neil Albert: From the moment you signed on to be an employee of the BID, you – none of my ideas that I've brought to the BID, creative or not, are my own: they –they are the property of the DowntownDC by virtue of the fact that you –that –that –that by the virtue of the fact that you – I'm an employee of the – of the DowntownDC Bid.

---

[62] Clarke declaration paragraphs 11, 13, 19 and 24, 15 TTABVUE; Opposer's notice of reliance exhibit 7, 9 TTABVUE 12-13 (zoom transcript); Applicant's notice of reliance exhibit L, 16 TTABVUE 155-156 (zoom transcript); Wallace declaration paragraph 8, 17 TTABVUE.

[63] Clarke declaration paragraph 11, 15 TTABVUE; Wallace declaration paragraph 7, 17 TTABVUE (Applicant "conceptualized the District of Fashion brand …").

[64] Albert declaration paragraph 5, 21 TTABVUE; Opposer's notice of reliance exhibit 4, 10 TTABVUE 38-39 (transcript telephone conversation); Applicant's notice of reliance exhibit M, 16 TTABVUE 186-187 (transcript telephone conversation).

Roquois Clarke: Right. I –

Neil Albert:      I know –

Roquois Clarke: --understand that.

According to Opposer's witness, Mr. Albert, there was no agreement that Applicant would own "an idea" that her employer (Opposer/BID) would fully fund, and there is no documentation to support this assertion.[65] Mr. Albert testified that "[i]t makes no sense whatsoever that I would agree to give an employee the right to own an idea that the employer, DowntownDC BID, would fully fund. Moreover, I did not have the legal authority to enter into such an agreement."[66] Opposer's witnesses Mr. Oliver and Ms. Hartman state that there is no license agreement between Applicant and Opposer for use of DISTRICT OF FASHION.[67] Applicant was paid nothing for the creation or use of the DISTRICT OF FASHION mark, only receiving her regular salary for her additional duties in conjunction with the DISTRICT OF FASHION event and bonuses for the fashion show event work as compensation.[68]

Mr. Oliver refers to Opposer's policy on information and communication technologies and Applicant's separation agreement as further support that Opposer

---

[65] Albert declaration paragraph 4 and 7, 21 TTABVUE.

[66] Albert declaration paragraph 4, 21 TTABVUE.

[67] Oliver declaration paragraph 15, 11 TTABVUE; Hartman declaration paragraph 22, 12 TTABVUE.

[68] Oliver declaration paragraph 14, 11 TTABVUE; Oliver declaration paragraph 11, 20 TTABVUE; Hartman declaration paragraph 22, 12 TTABVUE.

owns the DISTRICT OF FASHION brand and that such use of the mark is not allowed absent express authorization from Opposer.[69]

Opposer's information and communication technology policy provides that "all messages and data composed, sent, received or recorded on computers, electronic mail and voicemail systems are and remain the property of the organization, and are not the private property of any employee."[70]

Applicant's signed separation agreement under Paragraph 3(b), "Employee's additional obligations," states that "employee agrees that he will not disclose the Employer's information that is confidential in nature to any other person or buinsess corporation or company …. And that Employee will not use such confidential information for the benefit of himself or for the benefit of another person, business corporation or company …."[71]

---

[69] Oliver declaration paragraphs 9 and 25-27, 11 TTABVUE; Opposer's notice of reliance exhibit 5, 10 TTABVUE 61-68 (information and communications policy); Applicant's notice of reliance exhibit Q, 16 TTABVUE 266-273 (information and communications policy); Opposer's notice of reliance exhibit 9, 9 TTABVUE 40-44 (separation agreement); Applicant's notice of reliance exhibit K, 16 TTABVUE 144-148 (separation agreement). Applicant provided her signed signature page for the information and communications policy from 2016. Applicant's notice of reliance exhibit B, 16 TTABVUE 10 (Applicant's acknowledgement signature page for information and communications policy).

[70] Oliver declaration paragraph 9, 11 TTABVUE. Opposer's notice of reliance exhibit 5, 10 TTABVUE 61-68 (information and communications policy); Applicant's notice of reliance exhibit Q, 16 TTABVUE 266-273 (information and communications policy).

[71] Oliver declaration paragraphs 25-27, 11 TTABVUE; Opposer's notice of reliance exhibit 9, 9 TTABVUE 40-44 (separation agreement); Applicant's notice of reliance exhibit K, 16 TTABVUE 144-148 (separation agreement).

IV. Implied Consent on Unpled Issues

Applicant has argued an unpled abandonment defense in connection with Opposer's alleged prior rights in the mark DOWNTOWNDC DISTRICT OF FASHION.[72] Applicant argues "the record is devoid of evidence that Opposer was using Opposer's mark [DOWNTOWNDC DISTRICT OF FASHION] in the ordinary course of trade from 2005 or 2006 to 2018,"[73] which evidences Opposer's abandonment of the mark.[74]

However, in its brief, Opposer does not argue that it has used the DOWNTOWNDC DISTRICT OF FASHION mark since 2005.[75] Rather, Opposer argues in its brief that it has been using the DOWNTOWNDC DISTRICT OF FASHION mark since September 2018.[76] Thus, Opposer has restricted its claim of prior rights to no earlier than September 2018. As a result, we need not consider whether the parties tried Applicant's unpled abandonment defense, since the defense is moot.

---

[72] Applicant's brief, 24 TTABVUE 17.

[73] In the notice of opposition, Opposer alleged use of DOWNTOWNDC DISTRICT OF FASHION at least as early as May 4, 2005. Notice of Opposition, paragraph 2, 1 TTABVUE ("Opposer is also the owner of a common law mark for the term DOWNTOWNDC DISTRICT OF FASHION as used in connection with the organization of fashion shows since at least as early as May 4, 2005.").

[74] Applicant's brief, 24 TTABVUE 17.

[75] Additionally, Opposer did not submit into the record sufficient evidence of use before 2018. Dates of use listed in the pleaded application are not competent evidence of prior use. See Trademark Rule 2.122(b)(2), 37 C.F.R. § 2.11(b)(2) (dates of use in a registration are not evidence of use; dates must be established by competent evidence). Opposer's initial interrogatory responses are unverified and not competent evidence. Applicant's notice of reliance exhibit P, 16 TTABVUE 225-241 (Opposer's interrogatory responses).

[76] Opposer's brief, 23 TTABVUE 5, 9.

20

Applicant provided testimony and has argued the unpled defense of "implied license"[77] which we find to be directed to Opposer's claim of prior rights. Opposer preemptively argued in its brief that there was no license arrangement with Applicant and provided witness testimony on this issue.

Generally, parties in proceedings before the Board may not rely on unpleaded claims, issues or defenses, and the Board will not consider them. *See Kohler Co. v. Baldwin Hardware Corp.*, Can. No. 92041434, 2007 TTAB LEXIS 3, at *3 n. 3 (TTAB 2007) (raising claim for first time in plaintiff's brief is manifestly untimely; belated fraud claim given no further consideration). A party's pleading must be amended under Fed. R. Civ. P. 15(b) to assert the claim, issue or defense, or the claim, issue or defense must have been tried by express or implied consent under Fed. R. Civ. P. 15(b)(2) for the Board to consider it.

Because the implied license defense was not pleaded, nor amendment under Fed. R. Civ. P. 15(b) sought, it must have been tried by express or implied consent under Fed. R. Civ. P. 15(b)(2) in order to be considered at final decision. *See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, Opp. No. 91223982, 2020 TTAB LEXIS

---

[77] Applicant argues that any use by Opposer of DISTRICT OF FASHION was by implied license as there was no explicit or written assignment of any intellectual property created by Applicant during her employment with Opposer. 24 TTABVUE 10-12, 21, 24-25, 27. Thus, she asserts that she is entitled to register the DISTRICT OF FASHION mark since she created the mark, Opposer's use was by implied license during her employment, with any use inuring to her benefit, and such license did not result in a transfer of ownership of the mark. *Cf. Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1129 (9th Cir. 2006) ("Unlike in the typical implied licensing case, here the State asserts the doctrine of implied license as evidence of its ownership of the marks, as opposed to as a defense to an infringement action").

269, at *8 (TTAB 2020) (citation omitted), *appeal dismissed-in-part, aff'd-in-part, vacated-in-part on other grounds, and remanded*, 17 F.4th 129 (Fed. Cir. 2021); *see also Morgan Creek Prods. Inc. v. Foria Int'l Inc.*, Opp. No. 91173806, 2009 TTAB LEXIS 445, at *10-11 (TTAB 2009) ("The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter."); *H.D. Lee Co. v. Maidenform Inc.*, Opp. No. 91168309, 2008 TTAB LEXIS 21, at *12 (TTAB 2008) (same).

Our reading of the record shows that the implied license defense was tried by the parties by implied consent as contemplated by Fed. R. Civ. P. 15(b)(2). As is apparent from the record and briefs, the parties were aware the defense was being tried and provided testimony and argument on the issue. *Conolty v. Conolty O'Connor NYC LLC*, Opp. No. 91206045, 2014 TTAB LEXIS 269, at *6 (TTAB 2014) (matters will be found as having been tried by implied consent when, even if not expressly raised in the pleadings, the parties introduce evidence regarding the unpled matters without objection and discuss the issues relating thereto in their briefs).

Accordingly, Applicant's pleading is amended to allege the implied license defense. Fed. R. Civ. P. 15(b). *See, e.g.*, *Giersch v. Scripps Networks*, Inc., Can. No. 92045576, 2009 TTAB LEXIS 72, at *12 (TTAB 2009) (Board deemed pleading amended to conform to the evidence under Fed. R. Civ. P. 15(b) on abandonment defense where petitioner did not object on that ground in his reply brief, and instead addressed the merits of the defense).

22

V. Entitlement to a Statutory Cause of Action

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1304 (Fed. Cir. 2020).

To establish entitlement to a statutory cause of action under Trademark Act Section 13, 15 U.S.C., § 1063, a plaintiff must demonstrate "an interest falling within the zone of interests protected by the statute and … proximate causation." *Corcamore,* 978 F.3d at 1303 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-134 (2014)); *see also Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1070 (Fed. Cir. 2022). Stated another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1374-75 (Fed. Cir. 2020); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 1275 (Fed. Cir. 2014).

Opposer's witnesses testified about Opposer's use of DOWNTOWNDC DISTRICT OF FASHION in connection with high fashion runway shows.[78] This testimony is sufficient to establish Opposer's real interest and reasonable belief in damage. *See e.g.*, *Syngenta Crop Protection, Inc. v. Bio-Chek, LLC*, Opp. No. 91175091, 2009 TTAB LEXIS 70, at *16 (TTAB 2009) (witness testimony that opposer uses the mark in connection with a temperature sensing device sufficient to establish entitlement). In

---

[78] Hartman declaration paragraphs 9, 10, 13 and 15, 12 TTABVUE, Oliver declaration paragraphs 10-13, 11 TTABVUE.

addition, we have Applicant's admission that Opposer filed an application in the USPTO for the DOWNTOWNDC DISTRICT OF FASHION mark for fashion show services, which further supports entitlement.[79] *See Toufigh v. Persona Parfum, Inc.*, Can. No. 92048305, 2010 TTAB LEXIS 237, *5 (TTAB 2010) (entitlement found by filing of application in USPTO and the fact that the parties' marks are identical and goods arguably related).

Once statutory entitlement is sufficiently alleged (and established) for one claim, it is established for all asserted claims. *Corporacion Habanos SA v. Rodriguez*, Can. No. 92052146, 2011 TTAB LEXIS 258, at *15 (TTAB 2011).

## VI. Priority

To establish priority on a likelihood of confusion claim, a party must prove that, vis-à-vis the other party, it owns a mark or trade name previously used in the United States and not abandoned. 15 U.S.C. § 1052(d). To prove priority, Opposer relies on its use of the DOWNTOWNDC DISTRICT OF FASHION service mark since September 2018.[80]

---

[79] Opposer's notice of reliance exhibit 3, 10 TTABVUE 13-14 (Applicant's response to requests for admission 4); Applicant's notice of reliance exhibit V, 16 TTABVUE 382-383 (Applicant's response to requests for admission 4), discussed *supra.*

[80] Opposer's brief, 23 TTABVUE 5, 9. We note that in the notice of opposition, Opposer alleged common law use of the mark DOWNTOWNDC DISTRICT OF FASHION in interstate commerce "at least as early as August 26, 2019." Notice of opposition, paragraph 3, 1 TTABVUE.

We find Opposer's DOWNTOWNDC DISTRICT OF FASHION mark is distinctive as a whole since there is an absence of evidence or argument showing otherwise.[81] *Wet Seal Inc. v. FD Mgmt., Inc.*, Opp. No. 91157022, 2007 TTAB LEXIS 21, at *14 (TTAB 2007).

Opposer must prove by a preponderance of the evidence that its common law rights in the DOWNTOWNDC DISTRICT OF FASHION mark were acquired before any date upon which Applicant may rely. *Araujo v. Framboise Holdings Inc.*, 99 F.4th 1377, 1380 (Fed. Cir. 2024); *see RxD Media, LLC v. IP Application Dev.*, Opp. No. 91207333, 2018 TTAB LEXIS 37, at *23 (TTAB 2018) ("Opposer's acquisition of proprietary rights in its purported IPAD mark must precede Applicant's actual or constructive use of its mark.") (citing *Larami Corp. v. Talk to Me Programs Inc.*, Opp. No. 91085987, 1995 TTAB LEXIS 13, at *14 (TTAB 1995)), *aff'd*, 377 F. Supp. 3d 588, (E.D. Va. 2019), *aff'd*, 986 F.3d 361 (4th Cir. 2021).

In considering priority, "we look at the evidence as a whole, as if each piece of evidence were part of a puzzle which when fitted together, establishes prior use." *See W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 1125-26 (Fed. Cir. 1994). Oral testimony, if sufficiently probative, may be satisfactory to establish priority of use. *Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 103 (CCPA 1965). Oral

---

[81] Opposer's disclaimer of DOWNTOWN DC in its pleaded application is an admission that the term is not inherently distinctive. *See In re DNI Holdings Ltd.*, Ser. No. 76331011, 2005 TTAB LEXIS 515, at *25 (TTAB 2005) ("it has long been held that the disclaimer of a term constitutes an admission of the merely descriptive nature of that term ... at the time of the disclaimer."); *see also Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 1299 (CCPA 1972) (disclaimer is an admission of descriptiveness at the time the disclaimer was made).

testimony is strengthened by corroborative documentary evidence. *Elder Mfg. Co. v. Int'l Shoe Co.*, 194 F.2d 114, 118 (CCPA 1952); *see also Araujo,* 99 F.4th at 1380-81 (prior use of a mark established by declaration testimony of a single witness, based on the witness' personal knowledge, where the testimony was clear, convincing, uncontradicted and supported by documentary evidence).

"[I]n any controversy involving ownership of a particular mark or priority therein, the right thereto accrues to the party first to use the mark in trade and not to the first adopter but subsequent user in trade. In sum, trademark rights arise from use and not mere adoption." *La Maur, Inc. v. Int'l Pharm. Corp.*, Opp. No. 91057590, 1978 TTAB LEXIS 57, at *14-15 (TTAB 1978). Generally, the suggestion by an employee during employment that the employer market its product or service under a particular designation cannot bestow any proprietary right in the trademark or service mark upon the employee. *Scranton Plastic Laminating, Inc. v. Mason*, Opp. No. 91053914, 1975 TTAB LEXIS 85, at *27 (TTAB 1975) (citing cases); *see also Lorenzana v. S. Am. Rests. Corp.*, 799 F.3d 31, 33 n.4 (1st Cir. 2015) (quoting J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:36 (4th ed.) ("If an employee designs a mark in the course of employment and the employer uses it, it would seem clear that the employer is the 'owner' of the mark.")).

Both Opposer and Applicant rely on the same use of the mark DOWTOWNDC DISTRICT OF FASHION as the basis of their claims of prior rights in the mark.[82] It

---

[82] Applicant focuses her argument in her brief on Opposer's lack of ownership of DISTRICT OF FASHION. We find Applicant's lack of ownership argument is not an unpleaded defense,

is undisputed that the DOWNTOWNDC DISTRICT OF FASHION mark was used in connection with fashion shows promoted and produced by Opposer in 2018 and 2019 (September 5, 2018; February 7, 2019; and September 5, 2019) in the District of Columbia.[83] In this case, Applicant does not claim any use or even adoption of the mark prior to Opposer's asserted 2018 use. Applicant admits she never used the mark apart from Opposer's use in association with the 2018 and 2019 fashion shows, but relies on this use as inuring to her benefit.

Applicant argues that she created the mark outside of the scope of her employment,[84] there was no assignment to Opposer of the DOWNTOWNDC DISTRICT OF FASHION mark, and any use by Opposer was by implied license and inured to Applicant's benefit.[85] Thus, while it is undisputed that Applicant was

but "simply a focus on the element of ownership inherent in every inter partes proceeding under Section 2(d)." *Uveritech, Inc. v. Amax Lighting, Inc.*, Can. No. 92057088, 2015 TTAB LEXIS 242, at *7 (TTAB 2015); *see also Comput. Food Stores Inc. v. Corner Store Franchises, Inc.*, Opp. No. 91051942, 1973 TTAB LEXIS 5, at *12 (TTAB 1973) ("A right of ownership in and to a mark arises from prior use of said mark in connection with a particular product or service[.]").

[83] Hartman declaration paragraphs 14 and 17, 12 TTABVUE; Opposer's notice of reliance exhibit 15, 9 TTABVUE 66-73 (Opposer's website); Applicant's notice of reliance exhibit Q, 16 TTABVUE 311-318 (Opposer's website); Clarke declaration paragraph 12, 15 TTABVUE.

[84] The scope of employment issue frequently arises in copyright disputes. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989).

[85] Applicant's brief, 24 TTABVUE 21, 26-27. Applicant admits Opposer's sponsorship of the DOWNTOWNDC DISTRICT OF FASHION events. Opposer's notice of reliance exhibit 3, 10 TTABVUE 15-18 (Applicant's response to requests for admission 7, 8, 9, 10, & 12); Applicant's notice of reliance exhibit V, 16 TTABVUE 384-387 (Applicant's response to requests for admission 7, 8, 9, 10 & 12).

Applicant testified that Mr. Albert orally agreed that the fashion show event would be funded by Opposer but owned by Applicant. Clarke declaration paragraph 8, 15 TTABVUE ("I was then tasked by Neil Albert, President and CEO of the DowntownDC BID at the time, to start from scratch and utilize my personal experience and expertise and creativity to create something unique that the DowntownDC BID would fund, but that I would have ownership

Opposer's employee at the time of the creation of the DISTRICT OF FASHION mark and the fashion show productions, a contested issue is whether the DISTRICT OF FASHION mark was created within the scope of Applicant's employment.

There is no written agreement between the parties covering the DOWNTOWNDC DISTRICT OF FASHION trademark at issue, and their testimony demonstrates a fundamental disagreement as to who benefited from the use of the DOWNTOWNDC DISTRICT OF FASHION mark. Opposer's employees dispute any agreement, whether oral or written,[86] between Applicant and Opposer as to use of DOWNTOWNDC DISTRICT OF FASHION while Applicant argues that there was an implied license relating to its use.[87] Thus, resolution of the priority issue depends on what the record reveals as to whether the DOWNTOWNDC DISTRICT OF FASHION name and services were developed in the course of Applicant's employment, outside the scope of her employment, and/or whether there was an

---

in."). This testimony was soundly refuted by Mr. Albert who said he had no such authority to make such an agreement. Albert declaration paragraph 4, 21 TTABVUE ("This averment is unequivocally false. It makes no sense whatsoever that I would agree to give an employee the right to own an idea that the employer, DowntownDC BID, would fully fund. Moreover, I did not have the legal authority to enter into such an agreement."). See also Opposer's notice of reliance exhibit 4 (transcript telephone conversation) 10 TTABVUE 31-59; Applicant's notice of reliance exhibit M, 16 TTABVUE 179-207 (transcript telephone conversation).

[86] Albert declaration paragraph 7, 21 TTABVUE ("Ms. Clarke has not produced a single document to support her assertion – no emails, notes, correspondence of any sort, or credible statements from other witnesses with first hand knowledge – that she would own the Mark 'District of Fashion.'"). See also Opposer's response to document request no. 50 "none" concerning any documents relating to licensing by or on behalf of Applicant in connection with Applicant's mark. Applicant's notice of reliance exhibit R, 16 TTABVUE 342 (Opposer's discovery responses); Opposer's notice of reliance exhibit 22, 22 TTABVUE 57 (Opposer's discovery responses).

[87] Opposer's brief 23 TTABVUE 11; Applicant's brief 24 TTABVUE 26.

implied license between Applicant and Opposer with the benefit of Opposer's use of DOWNTOWNDC DISTRICT OF FASHION inuring to Applicant's benefit.

The record reflects a continuing employer-employee relationship between Applicant and Opposer during the period of late May 2016 through late March 2021. As to the DISTRICT OF FASHION mark, Applicant testified that she "workshopped a few name ideas at home then settled on District of Fashion and then began building upon that name and created a logo, a sponsorship deck."[88] She also stated she worked on the fashion shows "after hours on the logistics for every event and all the prep and planning was completed after hours."[89] Applicant argues that the work performed on the fashion show events was not within the scope of her employment.[90]

The Restatement (Third) of Agency provides:

> An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control.
>
> An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

---

[88] Clarke declaration paragraph 9, 15 TTABVUE.

[89] Clarke declaration paragraphs 9 and 13, 15 TTABVUE; Wallace declaration paragraph 8, 17 TTABVUE.

[90] Applicant's brief, 24 TTABVUE 22. Applicant argues that all copyrightable materials and Applicant's mark belong to Applicant. *Id.* We note that "ownership of a copyright confers no trademark rights on the copyright owner.... That is to say, [Applicant] owns no trademark rights in the term [DISTRICT OF FASHION] ... simply by virtue of [her alleged] ownership of a copyright...." *Clamage Indus. Ltd. v. Glendinning Cos.*, Can. No. 92009963, 1972 TTAB LEXIS 175, at *3 (TTAB 1972). The Board's jurisdiction is limited to trademark registrability; and the Board makes no determinations regarding copyright. *See McDermott v. S.F. Women's Motorcycle Contingent*, Opp. No. 91169211, 2006 TTAB LEXIS 390, at *16 (TTAB 2006) ("[T]he Board's jurisdiction is limited to determining whether trademark registrations should issue or whether registrations should be maintained").

29

Restatement (Third) of Agency § 7.07 (2006).

Although Applicant's job description did not specifically identify the organization or production of fashion shows, the job description for the position included event promotion using digital media (social media and website) and managing Opposer's social media and website, both of which apply to the fashion show promotion provided by Applicant on Opposer's website and social media. [91] Both Applicant and Opposer's witnesses testified that Applicant promoted the fashion show events on Opposer's website and social media channels.[92]

Part of Applicant's role as an employee of Opposer was "performing other event functions as needed," which is reflected in the testimony of Applicant's immediate supervisor, Ms. Hartman, and the May 2016 appointment letter signed by Applicant.[93] Work performed by Applicant for the fashion show event would fall within this description, as it is an event function. Notably, Applicant's 2018 and 2019 mid-year reviews (performance evaluations) evaluated Applicant's work on the fashion show events, and set performance goals for the fashion show event–work

---

[91] Hartman declaration paragraphs 13 and 17, 12 TTABVUE; Opposer's notice of reliance exhibits 15 and 16, 9 TTABVUE 64, 75-77 (website printouts from districtoffashion.org, promotional plan); Wallace declaration paragraph 5, 17 TTABUVE.

[92] Clarke declaration paragraph 11, 15 TTABVUE ("I promoted … the event … via public facing websites and also through the Downtowndc.org website and social media channel."); Albert declaration paragraph 8, 21 TTABVUE ("Ms. Clarke used the DowntownDC BID's website and financial resources to promote BID's event 'District of Fashion.'").

[93] Hartman declaration paragraph 6, 12 TTABVUE; Opposer's notice of reliance exhibit 2, 10 TTABVUE 9 (appointment letter); Applicant's notice of reliance exhibit A, 16 TTABVUE 8 (appointment letter).

goals on which both Applicant and her immediate supervisor, Ms. Hartman, signed off.

Excerpts of the mid-year reviews:[94]

2018
Roquois has taken on a leadership role in the fashion runway event. The BID will depend on her fashion industry experience as well as her marketing and design acumen to make this new, unique event a success. …

2019
Roquois … leadership qualities were on full display for District of Fashion, where she serves as co-creative director…. Due to the nature of her work, Roquois is often handed important assignments outside of business hours and projects with quick turnaround times. For these duties, Roquois makes herself available ….

Excerpts of the 2018 and 2019 fashion show event performance goals from the mid-year reviews:[95]

2018
Help label DC the District of Fashion with a NYFW-inspired runway show in September which will feature local designers and draw support from the local creative community. …

2019
District of Fashion: Secure new partners and sponsors to elevate the September event and increase its exposure in the local, national and international fashion communities.

According to Applicant's supervisor, Ms. Hartman, Applicant "worked on the BID's District of Fashion promotion by helping to train models, work on event

---

[94] Opposer's notice of reliance exhibits 11 and 13, 9 TTABVUE 49-50, 61-62 (mid-year reviews, performance evaluations); Applicant's notice of reliance exhibit C, 16 TTABVUE 20-23 (mid-year reviews, performance evaluations).

[95] Hartman declaration paragraphs 12-13, 12 TTABVUE; Opposer's notice of reliance exhibits 11 and 13, 9 TTABVUE 50, 62 (mid-year reviews, performance evaluations); Applicant's notice of reliance exhibit C, 16 TTABVUE 21, 23 (mid-year reviews, performance evaluations).

logistics and programming, securing sponsorships for the BID and creat[ing] marketing and promotional materials."[96] Applicant was a salaried employee and received bonuses for the work on the fashion show events as compensation.[97]

Applicant testified that she was tasked with creating the fashion show by Neil Albert, CEO of Opposer at the time.[98] Applicant did not work on the fashion show independent of other employees but was assisted by other BID employees. Opposer assigned Ms. Wallace, an Events & Strategic Partnerships Manager, (and later Senior Manager, Events & Partnerships), to the fashion show duties, although her normal role was to work on outdoor events.[99] Ms. Marsden, a freelance marketing coordinator used by Opposer, assisted Applicant and Ms. Wallace with the fashion show events by copy editing marketing materials for publishing, preparing signage, and performing day of fashion show duties.[100] Opposer's 2019 MOA with the CFAE identified Remi Wallace and Roquois Clarke as Opposer's dedicated staff members

---

[96] Hartman declaration paragraph 13, 12 TTABVUE.

[97] Oliver declaration paragraph 14, 11 TTABVUE; Oliver declaration paragraph 11, 20 TTABVUE ("Ms. Clarke and Ms. Wallace were paid bonuses as compensation for their work on the BID's Fashion Show"); Opposer's notice of reliance for rebuttal testimony exhibit 21, 22 TTABVUE 36 (earnings statement).

[98] Clarke declaration paragraph 8, 15 TTABVUE. It is not clear from this record if Applicant used Opposer's resources to work on the DISTRICT OF FASHION logo or other promotional or sponsorship materials. Opposer's witness indicated Applicant had access to Adobe Illustrator and Adobe Creative Suite, but Applicant did not address this issue in her testimony. Hartman declaration paragraph 8, 12 TTABVUE. Applicant was provided a laptop and cell phone for her work with Opposer. Opposer's notice of reliance exhibit 4 (transcript telephone conversation), 10 TTABVUE 30-59; Applicant's notice of reliance exhibit M, 16 TTABVUE 177-207 (transcript telephone conversation).

[99] Wallace declaration paragraphs 6 and 7, 17 TTABVUE; Wallace declaration paragraph 7, 17 TTABVUE ("I was told to work with Ms. Clarke on an indoor runway show concept").

[100] Marsden declaration paragraph 3, 18 TTABVUE.

assigned by Opposer to the fashion show events.[101] Applicant created business cards for herself and Ms. Wallace identifying them as co-creative directors of DOWNTOWNDC DISTRICT OF FASHION on behalf of Opposer.[102] Opposer noted Applicant's role as a co-creative director of the fashion show event in Applicant's 2019 mid-year review performance evaluation.[103]

Opposer assigned the fashion show work to Applicant, and Opposer had control over the work performed. Opposer's witness testified that Opposer provided monetary and in-kind sponsorships in connection with the fashion shows under the DOWNTOWNDC DISTRICT OF FASHION mark, spending more than $100,000 to promote the mark.[104] Opposer executed purchase orders and reimbursed Applicant for any advanced expenses in connection with the DOWNTOWNDC DISTRICT OF FASHION shows.[105] Opposer also spent $12,000 to hire a public relations firm to promote DISTRICT OF FASHION initiatives under a Letter of Agreement (LOA) to

[101] Hartman declaration paragraph 12, 12 TTABVUE; Opposer's notice of reliance exhibit 12, 9 TTABVUE 52-59 (MOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 280-289 (MOA).

[102] Wallace declaration paragraph 9, 17 TTABVUE.

[103] Opposer's notice of reliance exhibit 13, 9 TTABVUE 61-62 (mid-year review, performance evaluation); Applicant's notice of reliance exhibit C, 16 TTABVUE 22-23 (mid-year review, performance evaluation).

[104] Hartman declaration paragraph 14 and 15, 12 TTABVUE; Oliver declaration paragraphs 12 and 14, 11 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibits 19-21, 22 TTABVUE 4-53 (expense and reimbursement records).

[105] Hartman declaration paragraph 15, 12 TTABVUE; Wallace declaration paragraph 9, 17 TTABUVE; Oliver declaration paragraphs 8-12, 20 TTABVUE; Opposer's notice of reliance for rebuttal testimony exhibits 19-21, 22 TTABVUE 4-53 (expense and reimbursement records).

implement a public relations and marketing campaign for the fashion show events.[106]

Neither Applicant nor Ms. Wallace "could approve any task or expense without DowntownDC BID's senior management's express approval."[107] Clearly, Opposer, while relying heavily on Applicant's expertise in this area, was well aware of the fashion show work being performed by Applicant, having assigned her to work on these events and regularly approving tasks and expenses for these events.

There is no question that Applicant's work on promoting and producing the fashion shows was as Opposer's employee. Opposer, is a non-profit organization formed to promote the business interests in the District of Columbia. In this particular case, the purpose of the fashion show events was to promote the fashion and beauty industries in the District of Columbia and to create awareness of the fashion industry in the District of Columbia.[108]

Applicant and Opposer do not dispute that work on the fashion show required work after regular business hours and weekend work that was performed by Applicant and Ms. Wallace. [109] However, we do not give great weight to the fact that

---

[106] Oliver declaration paragraph 13, 11 TTABVUE; Opposer's notice of reliance exhibit 6, 10 TTABVUE 70-71 (LOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 290-291 (LOA).

[107] Oliver declaration paragraph 5, 20 TTABVUE.

[108] Hartman declaration paragraph 10, 12 TTABUVE; Oliver declaration paragraph 11, 11 TTABVUE; Opposer's notice of reliance exhibit 12, 9 TTABVUE 52-59 (MOA); Applicant's notice of reliance exhibit Q, 16 TTABVUE 280-289 (MOA). *See also* Wallace declaration paragraph 7, 17 TTABVUE ("Ms. Clarke took on the DowntownDC BID's new fashion industry initiative").

[109] We do not have any specific testimony about where Applicant's work was to be performed or the hours for such work. It appears that event support would be performed off-site (as identified in the appointment letter) ("support BID events with setup A/V, photography, and

some of the fashion show work was performed after hours,[110] given that Applicant could be tasked with work relating to "events" within her position description, the fashion show event was an initiative of Opposer and CFAE to promote the District of Columbia fashion and beauty industries, Applicant was tasked as a dedicated staff member by Opposer and identified as such under the MOA, the fashion show event work was mentioned in Applicant's mid-year evaluations, Applicant received bonuses for her efforts on the fashion show events, and the work performed by Applicant was primarily for the benefit of Opposer, whose purpose is to promote business interests in the District of Columbia.

The record is sufficient to establish a continuing employer-employee relationship between Opposer and Applicant during the 2018 and 2019 period when Applicant worked on the fashion shows under the DOWNTOWN DC DISTRICT OF FASHION brand and for us to find that Applicant performed the fashion show work within the scope of her employment with Opposer.

Under such circumstances, there is a prima facie presumption that any use of DOWNTOWNDC DISTRICT OF FASHION "during this period …. was done so [by

---

videography"); given its nature, this work may have occurred outside of traditional work hours. Hartman declaration paragraph 6, 12 TTABVUE; Opposer's notice of reliance exhibit 2, 10 TTABVUE 9 (appointment letter); Applicant's notice of reliance exhibit A, 16 TTABVUE 8 (appointment letter).

According to Ms. Wallace, Opposer's signature events were Momentum Awards, the Downtown Holiday Market, the State of Downtown Forum, and Bike to Work Day; other events were strategic and goal driven and sought to activate parks, plazas and streetscapes. Wallace declaration paragraphs 3 and 6, 17 TTABVUE.

[110] As indicated, some of the work Applicant performed for the fashion show events involved promoting the events on Opposer's website and social media platforms, which was identified as a job duty in Applicant's appointment letter, discussed in Applicant's 2018 and 2019 performance evaluations, and addressed in Ms. Hartman's and Ms. Wallace's testimony.

Applicant] as a representative or an agent of opposer, on behalf of opposer, and in furtherance of opposer's business; and any goodwill created by such use inured to opposer's benefit." *Scranton Plastic Laminating,* 1975 TTAB LEXIS 85, at *26-27.

Therefore, it is incumbent upon Applicant to overcome the prima facie presumption by presenting competent and convincing proof that Opposer's activities in regard to DOWNTOWNDC DISTRICT OF FASHION were instead as a licensee under Applicant's control and supervision. *Am. Asbestos Prods. Co. v. Horne,* Opp. No. 91042764, 1965 TTAB LEXIS 88, at *9-10 (TTAB 1965) (citation omitted). *See Gen. Motors Corp. v. Aristide & Co.,* Opp. No. 91167007, 2008 TTAB LEXIS 18, at *16 (TTAB 2008) ("A trademark owner can rely on the use of a licensee for its priority.").

A "trademark owner may contract to confer a license on another party," *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed. Cir. 1995), which "is a limited permit to another to use the mark." MCCARTHY ON TRADEMARKS § 18:1 (5th ed.). "In most instances under contract law, a … trademark owner intentionally creates an express license. … In some circumstances, however, the entire course of conduct between a … trademark owner … may create an implied license." *McCoy*, 67 F.3d at 920 (citing *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559 (Fed.Cir.1983)); *see also De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927) ("Any language used by the owner … or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use …. constitutes a license").

Opposer's witnesses Mr. Oliver and Ms. Hartman testified there was no license agreement and that Applicant was never paid separately for the creation and use of the DOWNTOWNDC DISTRICT OF FASHION mark but was a salaried employee.[111] The employment appointment letter and separation agreement signed by Applicant and Opposer do not specifically address intellectual property. Applicant signed Opposer's communication policy, which indicates that messages and data "composed, sent, received or recorded on computers, electronic mail and voicemail systems are and remain the property of the organization, and are not the private property of the employee."[112] Applicant's separation agreement indicates that confidential information obtained during employment may not be used by the employee.[113]

Ms. Hartman testified that "[b]ased on my knowledge, position with the BID, and supervision of Ms. Clarke, … the brand and marketing of the 'District of Fashion' belonged to DowntownDC BID; not Ms. Clarke."[114] Ms. Hartman also testified that "[t]here was no licensing agreement between DowntownDC BID and Ms. Clarke for use of the Mark 'District of Fashion.'"[115] Mr. Albert's telephone conversation with Applicant regarding the potential consultancy with Opposer and the use of

---

[111] Oliver declaration paragraphs 14 and 15, 11 TTABVUE; Hartman declaration paragraph 22, 12 TTABVUE.

[112] Oliver declaration paragraph 9, 11 TTABVUE; Opposer's notice of reliance exhibit 5, 10 TTABVUE 61-68 (information and communications policy); Applicant's notice of reliance exhibit Q, 16 TTABVUE 266-273 (information and communications policy).

[113] Oliver declaration paragraphs 25 and 26, 11 TTABVUE; Opposer's notice of reliance exhibit 9, 9 TTABVUE 40-44 (separation agreement); Applicant's notice of reliance exhibit K, 16 TTABVUE 144-148 (separation agreement).

[114] Hartman declaration paragraph 21, 12 TTABVUE.

[115] Hartman declaration paragraph 22, 12 TTABVUE.

DISTRICT OF FASHION during Applicant's prior period of employment reflected Opposer's position that there was no license agreement for the DISTRICT OF FASHION mark and that it was Opposer's brand: "[B]y virtue of [Applicant's] employment with the BID, [Applicant] did not own her ideas."[116]

"The test for whether or not an implied license existed is based solely on the objective conduct of the parties." *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000); *McCoy,* 67 F.3d at 920 ("In some circumstances, … the entire course of conduct … may create an implied license. … When warranted by such a course of conduct, the law implies a license.") (citations omitted); *see also First Fashion USA, Inc. v. Best Hair Replacement Mfrs., Inc.*, 645 F. Supp. 2d 1158, 1165 (S.D. Fla. 2009) ("[A]n implied license in fact arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.") (quoting *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1134 (D.N.J. 1993)) (internal quotation marks omitted). "[A]n implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party." *Stickle*, 716 F.2d at 1559. In cases where the parties have a "close working relationship," adequate quality control may be established in the absence of a formal agreement. *See, e.g., Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*, Can. No. 92021229, 1997 TTAB LEXIS 21, at *22-23 (TTAB 1997) (quoting *Taco*

---

[116] Albert declaration paragraph 10, 13 TTABVUE.

*Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1993), *aff'd*, 152 F.3d 942 (Fed. Cir. Mar. 5, 1998) (unpublished)).

Here, the objective conduct of the parties does not support an implied license. Although it is quite apparent that Opposer relied heavily on Applicant's experience and efforts to make the fashion show events a success, whatever subjective (and undisclosed to Opposer) beliefs Applicant may have harbored about this purported implied license of the DOWNTOWNDC DISTRICT OF FASHION mark were not reflected in her interactions with Opposer during her employment. We have no documentary evidence or testimony that Applicant ever raised the issue of use of the DOWNTOWNDC DISTRICT OF FASHION mark with Opposer during her employment. There also is no documentary evidence of payments to Applicant regarding Opposer's use of the DOWNTOWNDC DISTRICT OF FASHION mark. Instead, Applicant was paid her regular salary and given bonuses for her work on the fashion show events branded under the DOWNTOWNDC DISTRICT OF FASHION mark.

Aside from Applicant's duties to promote the DOWNTOWNDC DISTRICT OF FASHION shows on Opposer's social media and website and create other promotional materials, Applicant's performance appraisals described the additional work on the fashion shows as part of an employer-employee relationship, and not as a licensor-licensee; Applicant signed the performance appraisals. It was Opposer, not Applicant,

that approved all purchase orders and advances.[117] Opposer paid for all promotional expenses for the fashion show events in connection with the DOWNTOWNDC DISTRICT OF FASHION mark and reimbursed Applicant for advanced expenses. Opposer entered into an agreement with CFAE with the intent of promoting the fashion and beauty industries in the District of Columbia based on its co-sponsorship, and listing Applicant as a dedicated staff member tasked to assist with the preparation and execution of the fashion show events under the DOWNTOWNDC DISTRICT OF FASHION mark. Thus, Applicant was Opposer's representative assigned to the fashion show events who acted at the direction of Opposer. Opposer, not Applicant, stood behind the services offered under the mark DOWNTOWNDC DISTRICT OF FASHION.

After Applicant's employment ended, the telephone conversation between Applicant and Mr. Albert reflects Opposer's position that it owned the DOWNTOWNDC DISTRICT OF FASHION mark. It was Opposer, BID, who sent a cease and desist letter to Applicant upon the filing of Applicant's DISTRICT OF FASHION application with the USPTO without Opposer's consent.[118] Thus, the

---

[117] If Applicant were the licensor of the DISTRICT OF FASHION mark, Applicant would have to show that Opposer was merely a licensee under her control and supervision, but here the record shows the opposite. Applicant could not approve any task or expense related to the fashion shows without Opposer's senior management's express approval.

[118] The record does not reflect any attempt by Applicant to terminate Opposer's use of DOWNTOWNDC DISTRICT OF FASHION after Applicant's employment ended or any direction from Applicant to Opposer to cease use of DOWNTOWNDC DISTRICT OF FASHION. Thus, there is a lack of any indication that prior to this opposition Applicant attempted to raise or enforce any ownership rights Applicant alleged she had in the DISTRICT OF FASHION mark.

parties' objective intentions and expectations, as evidenced by Applicant's and Opposer's conduct, do not reflect an implied license but that Opposer owned the DOWNTOWNDC DISTRICT OF FASHION mark.

We find the 2018 and 2019 uses of DOWNTOWNDC DISTRICT OF FASHION inure to Opposer's benefit. Since Applicant has not used the DISTRICT OF FASHION mark, Applicant can only rely on the constructive use date of March 9, 2021, the application filing date. *See Aktieselskabet af 21. November 2001 v. Fame Jeans, Inc.*, Opp. No. 91163436, 2006 TTAB LEXIS 33, at *8 (TTAB 2006) (applicant can rely on its constructive use date for purposes of priority in this opposition proceeding, subject to applicant's establishment of constructive use) (citations omitted), *civil action dismissed*, 511 F. Supp. 2d 1 (D.D.C. 2007), *aff'd in part and rev'd in part*, 525 F.3d 8 (D.C. Cir. 2008).

Therefore, we find Opposer has priority for its DOWNTOWNDC DISTRICT OF FASHION mark.

## VII. Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (setting forth factors to be considered, referred to as "*DuPont* factors").

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103 (CCPA 1976) ("The fundamental

inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks.").

We discuss the *DuPont* factors for which there is relevant argument and evidence. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019); *see also Herbko Int'l v. Kappa Books, Inc.,* 308 F.3d 1156, 1164 (Fed. Cir. 2002) ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods [or services].'").

Although Applicant argues that likelihood of confusion is "immaterial," relying on its unpled abandonment defense which we have found moot, and Opposer argues that Applicant has conceded the issue of likelihood of confusion on this basis, Opposer still has the burden to prove likelihood of confusion. *Cf. Yazhong Inv. Ltd. v. Multi-Media Tech. Ventures, Ltd.*, Can. No. 92056548, 2018 TTAB LEXIS 168, at *12 n.13 (TTAB 2018) ("Because Respondent, as defendant herein, is under no obligation to submit evidence or a brief, we do not construe Respondent's failure to do so as a concession of the case."). Regardless of whether Applicant provided evidence or argument, Opposer bears the burden of proving its Section 2(d) claim by a preponderance of the evidence. *Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, Opp. No. 91263919, 2022 TTAB LEXIS 383, at *5-6 (TTAB 2022).

The following admissions by Applicant are relevant to likelihood of confusion:[119]

---

[119] Opposer's notice of reliance exhibit 3, 10 TTABVUE 17, 19-23, 25 (Applicant's response to requests for admission 11, 14, 15, 16, 17, 18, 19, 20 & 26) and Applicant's notice of reliance exhibit V, 16 TTABVUE 386, 388-392, 394 (Applicant's response to requests for admission 11, 14, 15, 16, 17, 18, 19, 20 & 26).

Applicant admits that Opposer's Mark, the validity of which Applicant denies, is substantially similar to Applicant's Mark (request no. 11).

Applicant admits that the services claimed under Applicant's Mark are offered to the general public (request no. 14).

Applicant admits that the services claimed under Applicant's Mark are offered [sic] cover a commercial market that includes, but is not limited to, millennials, models, designers and fashion media (request no. 15).

Applicant admits that the services claimed under Applicant's Mark are used for fashion show exhibits for commercial purposes, organization of fashion shows for commercial purposes, and/or organization of fashion shows for promotional purposes (request no. 16).

Applicant admits that the services claimed under Applicant's Mark would be or are advertised and/or sold in the District of Columbia (request no. 17).

Applicant admits that the services claimed under Applicant's Mark were and/or are advertised and or promoted using methods, including but not limited to digital media, print media, and broadcast media (request no. 18).

Applicant admits that the services claimed under Applicant's Mark were and/or are referenced heavily in print, digital, and social media coverage before, during and after District of Fashion events (request no. 19).

Applicant admits that the services claimed under Applicant's Mark were featured in WJLA, WUSA-9, DC Modern Luxury, FOX 5, and Good Morning Washington (request no. 20).

Applicant admits that from March 9, 2021 to date Applicant has not used Applicant's Mark in interstate commerce (request no. 26).

A. Similarity or Dissimilarity of the Marks

We compare Applicant's DISTRICT OF FASHION mark to Opposer's DOWNTOWNDC DISTRICT OF FASHION mark for similarities or dissimilarities in appearance, sound, connotation and commercial impression. *See Palm Bay Imps. Inc.*

*v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1371 (Fed. Cir. 2005).

The test, under the first *DuPont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather, whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the services offered under the respective marks is likely to result. *Coach Servs. Inc. v. Triumph Learning, LLC*, 668 F.3d 1356, 1368 (Fed. Cir. 2012) (quoting *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, Opp. No. 91160856, 2007 TTAB LEXIS 35, at *14 (TTAB 2007)).

Opposer's common law rights are for the mark as actually used, which is in a simple block font or lettering and sometimes with a design:



 DowntownDC's District of Fashion Runway Show

Applicant's mark is in standard characters, is not limited to any particular depiction (font style, size or color), and could conceivably be displayed in the same font style, size or color as Opposer's mark. *See In re Viterra Inc.*, 671 F.3d 1358, 1363-64 (Fed. Cir. 2012); *SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1041 (Fed. Cir. 1983)

([T]he argument concerning a difference in type style is not viable where one party asserts rights in no particular display"); Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a).

Opposer's mark DOWNTOWNDC DISTRICT OF FASHION encompasses the entirety of Applicant's mark, DISTRICT OF FASHION. While there is no rule that marks are automatically considered similar where one encompasses the entirety of another, the fact that Applicant's mark is subsumed by Opposer's mark increases the similarity between them. *See, e.g.*, *In re Mighty Leaf Tea*, 601 F.3d 1342, 1347-48 (Fed. Cir. 2010) (applicant's mark ML is similar to registrant's mark ML MARK LEES); *Double Coin Holdings Ltd. v. Tru Dev.*, Can. No. 92063808, 2019 TTAB LEXIS 347, at *20 (TTAB 2019) (finding ROAD WARRIOR and WARRIOR similar in their entireties in terms of appearance, sound, connotation and overall commercial impression); *Hunter Indus., Inc. v. Toro Co.*, Opp. No. 91203612, 2014 TTAB LEXIS 105, at *33 (TTAB 2014) (confusion found where applicant's PRECISION mark was incorporated in opposer's PRECISION DISTRIBUTION CONTROL mark) (citations omitted).

DOWNTOWNDC is Opposer's house mark, and describes the geographic location where the services are rendered, or that the services are otherwise connected with the District of Columbia. While not ignored, DOWNTOWNDC is entitled to less weight as purchasers are more likely to rely on the DISTRICT OF FASHION portion of the mark as an indication of source.[120] *See Bd. of Regents, Univ. of Tex. Sys. v. S.*

---

[120] The geographical extent of Opposer's activities is not a factor for consideration here, because Applicant is seeking a nationwide, unrestricted registration. *See In re Appetito Provisions Co.*, Ser. No. 73423405, 1987 TTAB LEXIS 47, at *2 n.4 (TTAB 1987) (a

*Ill. Miners, LLC*, Opp. No. 91183196, 2014 TTAB LEXIS 92 at *17 (TTAB 2014) ("[I]t is well-settled that disclaimed, geographically descriptive matter, such as the wording SOUTHERN ILLINOIS, may have less significance in likelihood of confusion determinations.").

In response to requests for admission, Applicant admitted that Opposer's Mark is substantially similar to Applicant's Mark (response to requests for admission 11).[121] Applicant also admitted that the addition of DOWNTOWNDC to DISTRICT OF FASHION "indicate[s] that Opposer was sponsoring certain District of Fashion events" (response to requests for admission 7, 8, 9, 10 & 12).[122]

Because DISTRICT OF FASHION forms a significant portion of Opposer's mark and DISTRICT OF FASHION is the entirety of Applicant's mark, we find the marks as a whole are similar in appearance, sound, connotation and commercial impression. The additional wording DOWNTOWNDC in Opposer's mark does not significantly alter the commercial impression, as purchasers will likely take DOWNTOWNDC as simply identifying the location of the services or their connection to the District of Columbia. Consumers thus are likely to view the two marks as variations of each other, but pointing to a single source.

---

geographically unrestricted registration under Section 7(b) of the Trademark Act "accords a registrant prima facie exclusive rights in the registered mark for the goods or services recited in the registration throughout the United States regardless of its actual extent of use.").

[121] Opposer's notice of reliance exhibit 3, 10 TTABVUE 17 (Applicant's response to requests for admission 11); Applicant's notice of reliance exhibit V, 16 TTABVUE 386 (Applicant's response to requests for admission 11).

[122] Opposer's notice of reliance exhibit 3, 10 TTABVUE 15-18 (Applicant's response to requests for admission 7, 8, 9, 10 & 12) and Applicant's notice of reliance exhibit V, 16 TTABVUE 384-387 (Applicant's response to requests for admission 7, 8, 9, 10 & 12).

We find the marks are similar in appearance, sound, meaning and commercial impression. The first *DuPont* factor weighs in favor of finding a likelihood of confusion.

B. Similarity or Dissimilarity of the Services

Under the second *DuPont* factor we consider the "similarity or dissimilarity and nature of the goods or services as described in an application or registration." *Dupont,* 476 F.2d at 1361. It is sufficient for a finding of likelihood of confusion if relatedness is established for any one of the identified goods or services within the class. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 1336 (CCPA 1981).

Where, as here, Opposer is relying on common law use of its mark, consideration of the question of likelihood of confusion must be confined to the specific services on which the mark has been used. Thus, we base our evaluation on the services as they are identified in Applicant's application and those services for which Opposer has established prior use with the DOWNTOWNDC DISTRICT OF FASHION mark. *See Hunter Indus.,* 2014 TTAB LEXIS 105, at *34 ("Although opposer's common law rights are limited to the actual goods and channels of trade for which it uses its mark, we must consider applicant's goods to encompass all the goods as they are recited in the application.") (citation omitted).

Opposer established prior use of DOWNTOWNDC DISTRICT OF FASHION in connection with fashion shows and runway shows to promote the beauty and fashion industries in the District of Columbia.[123]

Applicant's services are identified in the application as "Fashion show exhibitions for commercial purposes; Organisation of fashion shows for commercial purposes; Organization of fashion shows for commercial purposes; Organization of fashion shows for promotional purposes."

Opposer's fashion shows are for promotional purposes. Therefore, the parties' services are identical in part. The second *DuPont* factor weighs heavily in favor of a finding of likelihood of confusion. *See New Era Cap Co. v. Pro Era, LLC*, Opp. No. 91216455, 2020 TTAB LEXIS 199, at *53 (TTAB 2020) ("the in-part identity of Applicant's and Opposer's goods and their overlapping channels of trade and classes of purchasers … weigh heavily in favor of a finding of likelihood of confusion").

## C. The Established, Likely-to-continue Trade Channels, and the Classes of Purchasers

We consider the "similarity or dissimilarity of established, likely-to-continue trade channels" and classes of purchasers. *DuPont*, 476 F.2d at 1361.

Because Opposer relies on its common law rights, for purposes of this analysis, Opposer can claim only those channels of trade and classes of consumers which it has established on the record. *See Hunter Indus.,* 2014 TTAB LEXIS 105, at *34

---

[123] Hartman declaration paragraphs 7 and 9-15, 12 TTABVUE; Applicant's notice of reliance exhibit R, 16 TTABVUE 343 (Opposer's supplemental interrogatory response 2); Opposer's notice of reliance for rebuttal testimony exhibit 22, 22 TTABVUE 58 (Opposer's supplemental interrogatory response 2).

(opposer's common law rights are limited to the channels of trade for which it uses its mark). We cannot rely on a presumption that because the fashion show services of the parties are identical in part, they move in the same channels of trade and are provided to the same classes of purchasers. *Bell's Brewery, Inc. v. Innovation Brewing*, Opp. No. 91215896, 2017 TTAB LEXIS 452, at *12 (TTAB 2017) (no presumptions attach to unregistered common law mark).

Opposer's witness Ms. Hartman testified that the fashion show event is held in the District of Columbia as it is an event to promote the fashion and beauty industries of the District of Columbia; in 2019 the fashion show was marketed to local, national and international communities.[124] The marketing vehicles included Opposer's website, social media, digital and print material, and a marketing campaign developed by a public relations firm.[125] Applicant's witness Ms. Hartman authenticates exhibit 14 of Opposer's notice of reliance, as providing marketing statistics,[126] which provides the targeted audience as male & female fashion influencers and bloggers aged 25-60, millennials, stylists, fashion buyers, and fashion aficionados.[127]

Applicant admits that the services claimed under Applicant's Mark would be or are advertised and/or sold in the District of Columbia, that her services are offered to

---

[124] Hartman declaration paragraphs 10 and 13, 12 TTABVUE.

[125] Hartman declaration paragraphs 9, 11, and 13, 12 TTABVUE.

[126] Hartman declaration paragraph 16, 12 TTABVUE; Opposer's notice of reliance exhibit 14, 9 TTABVUE 64 (marketing data).

[127] Opposer's notice of reliance exhibit 14, 9 TTABVUE 64 (marketing data). This data compilation is a business record that is excepted from hearsay. Fed. R. Civ. P. 803(6).

the general public, and that the commercial market covers and includes, but is not limited to, millennials, models, designers and fashion media (response to requests for admission 14, 15, 17).[128] Applicant admits that the advertising and promotional methods used in connection with the fashion show events include digital media, print media, and broadcast media (response to requests for admission 18).[129]

In view of the foregoing, we find that the channels of trade and classes of consumers will overlap, which also weighs in favor of finding a likelihood of confusion.

## VIII. Conclusion

All of the *DuPont* factors for which there is evidence in the record—the similarity of the marks, the in-part identical nature of the services, the trade channels and classes of consumers—favor likelihood of confusion. *In re Charger Ventures LLC*, 64 F.4th 1375, 1381 (Fed. Cir. 2023). We therefore conclude that confusion is likely.

**Decision**: The opposition is sustained under Section 2(d).[130]

---

[128] Opposer's notice of reliance exhibit 3, 10 TTABVUE 19-21 (Applicant's response to requests for admission 14, 15 & 17); Applicant's notice of reliance exhibit V, 16 TTABVUE 388-390 (Applicant's response to requests for admission 14, 15 & 17).

[129] Opposer's notice of reliance exhibit 3, 10 TTABVUE 21-22 (Applicant's response to requests for admission 18); Applicant's notice of reliance exhibit V, 16 TTABVUE 390-391 (Applicant's response to requests for admission 18).

[130] Because we have resolved this proceeding on Opposer's likelihood of confusion claim, we need not and do not reach Opposer's fraud claim. *See Yazhong Inv.,* 2018 TTAB LEXIS 168, at *44 n.52; *Multisorb Tech., Inc. v. Pactiv Corp.*, Can. No. 92054730, 2013 TTAB LEXIS 616, at *7 (TTAB 2013).